UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
TREVOR MURRAY,                                          :
                                                        :
                              Plaintiff,                :
                                                        :       12 Civ. 5914 (KPF)
                    v.                                  :
                                                        :       OPINION AND ORDER
UBS SECURITIES, LLC and UBS AG,                         :
                                                        :
                              Defendants.               :
                                                        :
--------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   01/27/2014 |

KATHERINE POLK FAILLA, District Judge:

On August 2, 2012, Plaintiff Trevor Murray filed this action against

Defendants UBS Securities, LLC ("UBS Securities"), and UBS AG ("UBS")

(collectively, "Defendants") under 15 U.S.C. § 78u-6(h), the anti-retaliation

provision (the "Anti-Retaliation Provision") of the Dodd-Frank Wall Street

Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat.

1376 ("Dodd-Frank").  Specifically, Plaintiff alleged that Defendants violated the

Anti-Retaliation Provision in terminating Plaintiff's employment after, and as a

result of, Plaintiff making certain disclosures protected under Section 806 of

the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745

("Sarbanes-Oxley").

Defendants have moved pursuant to the Federal Arbitration Act (the

"FAA"), 9 U.S.C. §§ 1-14, to compel Plaintiff to arbitrate the claim he raises in

this action.  For the reasons set forth in the remainder of this Opinion,

Defendants' motion to compel is granted and the instant action is stayed.

## FACTUAL BACKGROUND[1]

**A.    Plaintiff's Employment With UBS Securities**

According to his Complaint, Plaintiff was first employed by UBS
Securities, a broker-dealer registered with the United States Securities and
Exchange Commission (the "SEC"), from approximately May 2007 to September
2009, at which time Plaintiff was laid off.  (Compl. ¶ 8).[2]  Thereafter, in early
2011, UBS Securities solicited Plaintiff to return to work for the company.  (*Id.*
at ¶ 10).  In or around May 2011, Plaintiff rejoined UBS Securities as a Senior
Commercial Mortgage-Backed Security ("CMBS") Strategist and Executive
Director.  (*Id.* at ¶ 11).  In that position, Plaintiff was "responsible for
performing research and creating reports about CMBS products that were
distributed to Defendants' current and potential clients, and in which UBS
Securities held trading positions."  (*Id.* at ¶ 2).

**B.    Plaintiff's Agreements to Arbitrate with Defendants**

**1.    Plaintiff's Employment Agreement**

When Plaintiff rejoined UBS Securities, he received a formal offer letter
dated April 26, 2011 (the "Employment Agreement"), signed by Katie Dresch,
then a Director in UBS's Human Resources Department.  (Compl. ¶ 11; Mara

---

[1]    The facts contained in this Opinion are drawn from Plaintiff's Complaint ("Compl.")
(Dkt. #1) and the Declaration of Aidan Mara ("Mara Decl.") (Dkt. #29), including the
exhibits thereto.

       In this Opinion, Defendants' Memorandum of Law in Support of Their Motion to Compel
Arbitration is referred to as "Def. Br."; Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion to Compel Arbitration is referred to as "Pl. Opp."; and Defendants'
Reply in Support of Their Motion to Compel Arbitration is referred to as "Def. Reply."

[2]    UBS Securities is a wholly-owned subsidiary of UBS, a Swiss corporation that conducts
business and has offices in New York.  (Compl. ¶¶ 6-7).

Decl., Exh. A). Plaintiff, by his signature, "[a]ccepted and agreed to" the Employment Agreement on May 2, 2011, and returned it to UBS. (Mara Decl. ¶ 5 and Exh. A).

The Employment Agreement "incorporates UBS's standard terms, conditions, and policies of employment as they existed on May 2, 2011, and which UBS, at that time, incorporated into all offer letters in the course of business." (Mara Decl. ¶ 4; *see also* Mara Decl., Exh. A (reciting that the Agreement "shall be governed, construed and enforced in accordance with the law of the State of Connecticut")). As relevant to the instant case, the Employment Agreement includes an agreement to arbitrate that provides:

> [Plaintiff] and [UBS Securities] hereby knowingly and voluntarily agree that any dispute, controversy or claim (including but not limited to those arising out of or relating to this Agreement, the employment relationship between [Plaintiff] and [UBS Securities] or the termination thereof) will be settled by final and binding arbitration, unless prohibited by applicable law. The parties' agreement to arbitrate disputes includes, but is not limited to … any [] statutory or common law claims. Arbitration under this agreement will be conducted pursuant to [UBS Securities'] employment arbitration procedures in effect at the time of the filing of a claim. A copy of the employment arbitration procedures as currently in effect is attached hereto as Exhibit A.

(Mara Decl., Exh. A).

UBS's employment arbitration procedures (the "Arbitration Procedures") reiterated the parties' agreement to arbitrate "any employment-related disputes between [Plaintiff] and [UBS Securities]." (Mara Decl., Exh. A). The Arbitration Procedures provided, however, that "[c]laims arising under the Sarbanes-Oxley Act of 2002 … are not covered by these procedures and will continue to be addressed in accordance with applicable law." (*Id.*). The Arbitration

3

Procedures further required that the "arbitration ... be conducted pursuant to the JAMS Employment Arbitration Rules & Procedures ... then in effect." (*Id.*). The arbitration procedures in effect at the time Plaintiff filed the Complaint included these same provisions.  (Mara Decl., Exh. B).

### 2.    Plaintiff's Form U-4

As part of his employment with UBS Securities, Plaintiff also executed a Form U4 Uniform Application for Securities Industry Registration or Transfer ("Form U-4") on June 2, 2011, pursuant to which Plaintiff agreed

> to arbitrate any dispute, claim or controversy that may arise between [Plaintiff] and [UBS Securities], or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [self-regulatory organizations, or "SROs"] indicated in Section 4 (SRO Registration) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(Mara Decl. ¶ 8 and Exh. C).  Plaintiff identified, among others, the Financial Industry Regulatory Authority ("FINRA") as an applicable SRO.  (*Id.* at Exh. C).

## C.    The Termination of Plaintiff's Employment

According to Plaintiff, during his second stint with UBS Securities, senior personnel involved in CMBS trading and commercial mortgage origination made a "concerted effort" to influence Plaintiff "to skew his published research in ways designed to support UBS Securities' ongoing CMBS trading and loan origination activities."  (Compl. ¶¶ 2, 13).  As examples, Plaintiff detailed a series of interactions with individuals responsible for CMBS trading, during which, among other things, those individuals instructed Plaintiff (i) "not to publish anything negative" about investments or areas in which UBS Securities

had exposure and (ii) to "write what the business line wanted." (*Id.* at ¶¶ 15-16, 20). Plaintiff further claimed that he was "pressured to produce ostensibly objective research reports about [UBS Securities'] securities products that were … false or misleading, and intended to favor UBS Securities' products and trading positions, in violation of federal laws." (*Id.* at ¶ 19).

According to Plaintiff, he refused to publish any material that conflicted with his research, and "repeatedly told his superiors at UBS Securities" about these encounters. (Compl. ¶ 18). Specifically, in or around December 2011, Plaintiff told his manager about the negative response he had received to his research, including criticisms that Plaintiff's published articles were "too bearish" and "off message with the strategy of the trading desk and overall commercial mortgage group." (*Id.*). Plaintiff also alleged that in or around January 2012, he informed a Managing Director of UBS Securities that the head of CMBS trading and commercial mortgage originations had "only interacted with Plaintiff to criticize his research and attempt to manipulate his reports." (*Id.*).

On February 6, 2012, UBS Securities advised Plaintiff that he was terminated. (Compl. ¶ 22). In the Complaint, Plaintiff notes his "impeccable record," and claims that his termination was motivated, at least in part, by Plaintiff informing his superiors about the attempts by others at UBS Securities to skew Plaintiff's published research. (*Id.* at ¶¶ 22, 24). Proceeding from this premise, Plaintiff claims that his termination violated the Anti-

5

Retaliation Provision because the disclosures that he made to his superiors were protected by Sarbanes-Oxley.

## D.    The Instant Litigation

Plaintiff filed the Complaint on August 2, 2012.  (Dkt. #1).  That same day, Plaintiff separately "submitted a Complaint to the United States Department of Labor, charging that Defendants' termination of Plaintiff also violated [Sarbanes-Oxley] and 12 U.S.C. § 5567,"[3] the latter of which was another Dodd-Frank provision.  (Compl. ¶ 1, n.1).

On September 21, 2012, Defendants moved to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  (Dkt. #13).  On May 21, 2013, the Court denied Defendants' motion. *See Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21, 2013).

On June 14, 2013, Defendants answered Plaintiff's Complaint, asserting, as an affirmative defense, that "Plaintiff's claims may not be brought in this Court because they are subject to compulsory arbitration pursuant to the parties' employment agreement and … [the] Form U-4."  (Dkt. #26).  On that same day, Defendants filed the instant motion to compel arbitration. (Dkt. #27).  Plaintiff filed his opposition on July 19, 2013 (Dkt. #34), and Defendants submitted their reply on August 2, 2013 (Dkt. #35).  In light of the

---

[3]    The Complaint states that "[i]f no decision is reached on Plaintiff's claims under [Sarbanes-Oxley] within 180 days [i.e., January 29, 2013], and under 12 U.S.C. § 5567 within 210 days [i.e., August 2, 2012], Plaintiff will seek to amend the instant Complaint to include these claims, pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 12 U.S.C. § 5567(c)(4)(D)(i)."  (Compl. ¶ 1, n.1).  Plaintiff has not sought to amend his Complaint, and the Court is unaware of the status of the administrative action.  The status of that action, however, has no bearing on the resolution of the instant motion.

motion practice to date, the Court has not conducted an initial pretrial conference, nor has it endorsed a case management plan or formal discovery schedule.

## DISCUSSION

### A.    Applicable Law

The FAA "'creates a body of federal substantive law of arbitrability applicable to arbitration agreements ... affecting interstate commerce.'" *Ragone* v. *Atl. Video of Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Alliance Bernstein Inc. Research & Mgmt., Inc.* v. *Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006)). "[E]nacted in 1925[,] in response to widespread judicial hostility to arbitration agreements," *AT&T Mobility LLC* v. *Concepcion*, 131 S. Ct. 1740, 1745 (2011), the FAA provides, in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The Supreme Court and the Second Circuit have consistently recognized that the FAA embodies a "liberal federal policy favoring arbitration agreements." *CompuCredit Corp.* v. *Greenwood*, 132 S. Ct. 665, 669 (2012); *see also AT&T Mobility LLC*, 131 S. Ct. at 1750 ("[O]ur cases place it beyond dispute that the FAA was designed to promote arbitration"; noting that the Act "embod[ies] a national policy favoring arbitration, and a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or

procedural policies to the contrary" (internal citations and quotation marks omitted)); *Sutherland* v. *Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013) ("In analyzing this provision of the FAA, the Supreme Court has remarked on several occasions that it establishes a liberal federal policy favoring arbitration agreements." (internal quotation marks omitted)).  Central to this policy is the tenet that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Guyden* v. *Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).  This tenet remains true "even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'"  *CompuCredit Corp.*, 132 S. Ct. at 669 (quoting *Shearson/Am. Express Inc.* v. *McMahon*, 482 U.S. 220, 226 (1987)).

It is well settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).  "The question whether the parties have submitted a particular dispute to arbitration, i.e., the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Schneider* v. *Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam*, 537 U.S. at 83 (emphasis in original)).  To that end, Section 4 of the FAA allows "a party to an arbitration agreement [to] petition a United States district court for an order directing that 'arbitration proceed in the manner provided for in such agreement.'"  *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting 9 U.S.C. § 4).

"In the context of motions to compel arbitration … the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *accord Hines* v. *Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines*, 380 F. App'x at 24. Conversely, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington* v. *Atl. Sounding, Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010).

**B.    Analysis**

### 1.    Defendants Did Not Waive Any Right to Arbitrate

Before addressing the arbitrability of Plaintiff's claim, the Court must first resolve the threshold issue of whether Defendants have waived any right they may have to arbitrate this dispute as a result of their conduct in this litigation. Plaintiff contends that Defendants' waiver is evidenced by their actions in filing in the first instance a motion to dismiss, and in not moving to compel arbitration until "nearly ten and a half months after this action began." (Pl. Opp. 8). Plaintiff also claims prejudice in the expenditure of time and resources in defending against Defendants' motion to dismiss — which expenditures, he claims, he will be forced to duplicate when Defendants make the same arguments in arbitration. (*Id.*). Defendants respond that moving to

9

dismiss Plaintiff's Complaint, without more, does not result in waiver.  (Def. Reply 2).

"A party is deemed to have waived its right to arbitration if it engages in protracted litigation that results in prejudice to the opposing party."  *S & R Co. of Kingston* v. *Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998) (internal quotation marks omitted).[4]  The Second Circuit has established a three-part test to determine whether a party has waived its right to arbitrate that considers "[i] the time elapsed from when litigation was commenced until the request for arbitration; [ii] the amount of litigation to date, including motion practice and discovery; and [iii] proof of prejudice."  *Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 229 (2d Cir. 2001).  In this context, delay alone does not establish waiver.  *PPG Indus., Inc.* v. *Webster Auto Parts, Inc.*, 128 F.3d 103, 108 (2d Cir. 1997).  Rather, any delay must be considered "in conjunction with [] the amount of litigation that occurred during that period," and any proof of prejudice suffered by the party seeking to avoid arbitration.  *Id.*

Plaintiff is correct that Defendants did not move to compel arbitration until approximately ten and one-half months after Plaintiff filed his Complaint. However, the parties' litigation efforts during that time period were modest, and

---

[4]     Because Defendants have engaged in "prior litigation" on this dispute, the issue of waiver may be properly decided by the Court.  *S & R Co. of Kingston,* 159 F.3d at 83 ("[T]he district court could properly decide the question [of waiver] when the party seeking arbitration had already participated in litigation on the dispute."); *see also Bell* v. *Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002) (same);  *Doctor's Assocs., Inc* v. *Distago*, 66 F.3d 438, 456 n.12 (2d Cir. 1995) ("[W]e are bound to hold that a district court may reach the question of waiver whenever a party seeking arbitration has engaged in any prior litigation.").

focused largely (if not exclusively) on Defendants' motion to dismiss.  No initial pretrial conference was held, nor was any case management plan or discovery schedule entered.  The motion to dismiss was fully briefed approximately four and one-half months after the case was filed and, except for the submission of supplemental authority to support said motion, the case remained dormant until the motion to dismiss was decided, after which time Defendants promptly (indeed, within one month) filed their motion to compel arbitration along with an answer that interposed, as an affirmative defense, Plaintiff's obligation to arbitrate.

"The key to a waiver analysis is prejudice."  *Thyssen, Inc.* v. *Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002); *Leadertex* v. *Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995) ("[T]here can be no waiver unless that conduct resulted in prejudice to the other party.").  The Second Circuit recognizes two kinds of prejudice — substantive prejudice and prejudice due to excessive cost and time delay.  *Thyssen*, 310 F.3d at 105; *Kramer* v. *Hammond*, 943 F.2d 176, 179 (2d Cir. 1991).  The former can arise "when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration," while the latter can arise "when a party too long postpones his invocation of his contractual right to arbitration, and thereby causes his adversary to incur unnecessary delay or expense." *Thyssen*, 310 F.3d at 105.

The prejudice argued by Plaintiff is more apparent than real.  Plaintiff first argues that Defendants are attempting to relitigate their motion to dismiss

by moving to compel arbitration.  (Pl. Opp. 12).  They are not.  Although Defendants may raise a similar defense in arbitration as they did when moving to dismiss Plaintiff's Complaint, as Plaintiff contends (*see id.*), that similarity alone does not establish the requisite prejudice to support a finding of waiver. *See Jung* v. *Skadden, Arps, Slate, Meagher & Flom, LLP*, 434 F. Supp. 2d 211, 216 (S.D.N.Y. 2006) ("[Plaintiff] may face similar challenges to the amended complaint in arbitration, just as [Plaintiff] may face another Rule 12(b)(6) motion in response to the amended complaint in proceedings before this court, but such a situation is not relitigation.").

Plaintiff's reliance on *Kramer* v. *Hammond*, 943 F.2d 176 (2d Cir. 1991), to support his substantive prejudice argument is similarly unavailing.  (*See, e.g.*, Pl. Opp. 11-14).  What animated the *Kramer* Court's finding of waiver was not, as Plaintiff suggests, the mere filing of a motion to compel after a motion to dismiss, but rather the fact that the defendant in that case had "engage[ed] in extensive pre-trial litigation for over four years" in multiple forums.  *Id.* at 178. Here, in sharp contrast, as a result of Defendants' motion to dismiss, Plaintiff has been provided with a preview of what to expect during arbitration, as well as a detailed decision from the Court finding certain issues resolved in his favor.

Plaintiff's related argument that Defendants' initial decision to file a motion to dismiss is itself a sufficient basis on which to find waiver (*see* Pl. Opp. 10-11) is soundly refuted by Second Circuit precedent to the contrary. *See, e.g.*, *Rush* v. *Oppenheimer & Co.*, 779 F.2d 885, 888 (2d Cir. 1985)

("Rather than immediately seeking arbitration in response to [Plaintiff's] complaint, defendants moved to dismiss.  Such a motion alone, however, does not waive the right to arbitrate."); *Sweater Bee by Banff, Ltd.* v. *Manhattan Indus., Inc.*, 754 F.2d 457, 463 (2d Cir. 1985) (holding that a defendant's filing of a motion to dismiss, "specifically permitted by Fed. R. Civ. P. 12(b) to be filed before [an] answer," does not result in waiver); *Mahmoud Shaban & Sons Co.* v. *Mediterranean Shipping Co., S.A.*, No. 11 Civ. 6322 (TPG), 2013 WL 5303761, at *2 (S.D.N.Y. Sept. 20, 2013) ("[I]t is well established that [a third-party defendant's] choice to file a motion to dismiss before moving to compel arbitration does not itself waive [a third-party defendant's] right to enforce the arbitration clause after the motion to dismiss is resolved."); *Jung*, 434 F. Supp. 2d at 218 (holding that a motion to dismiss the complaint did not waive a defendant's right to arbitration); *Becker* v. *DPC Acquisition Corp.*, No. 00 Civ. 1035 (WK), 2002 WL 1144066, at *13 (S.D.N.Y. May 20, 2002) (holding that "Defendants did not waive their right to arbitration by litigating their motions to dismiss or requesting extensions of time in which to brief those motions," and recognizing that "the Second Circuit has held that a party litigating a motion to dismiss 'does not waive the right to arbitrate'" (quoting *Rush*, 779 F.2d at 888)); *Scott* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 89 Civ. 3749 (MJL), 1992 WL 245506, at *3 (S.D.N.Y. Sept. 14, 1992) ("[Defendant's] motion to dismiss the complaint does not waive [its] right to arbitration."); *cf. Chatham Shipping Co.* v. *Fertex S. S. Corp.*, 352 F.2d 291, 293 (2d Cir. 1965)

13

(recognizing that the "earliest point at which [a party may have waived its right to arbitration] may be found [] when [that] party files an answer on the merits").

Undaunted, Plaintiff maintains that the holdings in two of these decisions, *Rush* and *Sweater Bee*, are limited to situations involving complaints that contain both arbitrable and non-arbitrable claims.  (Pl. Opp. 13-14).  Those cases, however, have not been construed so narrowly.  *See, e.g., Jung*, 434 F. Supp. 2d at 218 n.5 ("That *Sweater Bee* involved a complaint containing both arbitrable and nonarbitrable claims ... does not suggest a different result." (internal citation omitted)).  Indeed, *Rush* virtually compels the conclusion that Defendants have *not* waived their right to arbitrate, inasmuch as the Second Circuit held that a finding of waiver could not be found on facts demonstrating more efforts toward litigating the case than are present before this Court:

> Thus, none of the individual aspects of the pretrial proceedings conducted by the defendants — the eight-month delay, the motion to dismiss, the conduct of discovery, and the answer — prejudiced [Plaintiff] in any sense that would support a conclusion of waiver by defendants of their contractual right to arbitrate.  Neither does the combination of defendants' activities, taken as a whole, justify such a conclusion.

779 F.2d at 889.  For all of these reasons, the Court finds that Defendants have not waived their right to arbitrate.

### 2.  Plaintiff's Claim Should Be Submitted to Arbitration

Broadly speaking, in order to determine whether a claim should be submitted to arbitration, a court must assess (i) whether the parties had an agreement to arbitrate; (ii) the scope of that agreement; (iii) if federal statutory claims are asserted, whether Congress intended those claims to be

14

nonarbitrable; and (iv) if some, but not all, of the claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration. *Guyden*, 544 F.3d at 382; *JLM Indus., Inc.* v. *Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004); *Oldroyd* v. *Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998). Plaintiff does not challenge that he has valid agreements to arbitrate with Defendants. (*See* Pl. Opp. 16). Instead, the parties' disputes concern (i) whether Congress intended to proscribe arbitration of Plaintiff's specific claim and (ii) the scope of the parties' arbitration agreements.

As noted *infra* in this section, the parties' arbitration agreements are expansive, and appear to accord to the arbitrator the responsibility for determining all issues of arbitrability. As broad as these agreements are, however, the parties have also expressly contracted that "[c]laims arising under the Sarbanes-Oxley Act of 2002 … are not covered by these procedures and will continue to be addressed in accordance with applicable law." (Mara Decl., Exh. A). The parties do not, however, address the breadth of the arbitration agreements in their briefs, and instead frame the issues in a manner that seeks to have this Court decide certain disputes about arbitrability. The argument could be made that the Court should refrain from resolving these disputes and simply grant the motion to compel. After considering what the parties have agreed to arbitrate, and what they have specifically excepted from arbitration, the Court has decided to address only the issues of the precise claim advanced by Plaintiff, and the degree to which that claim falls within the specific exception for Sarbanes-Oxley claims discussed above. *See Howsam*, 537 U.S.

at 83-84 (recognizing that a court should decide an arbitrability issue "where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well have not agreed to arbitrate").

**i.     Plaintiff's Claim Arises Under Dodd-Frank's Anti-Retaliation Provision**

Dodd-Frank was enacted in the wake of the 2008 financial crisis.  The text of the statute describes it as "[a]n Act [t]o promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes."  Pub. L. No. 111-203, 124 Stat. 1376 (2010).  Among many other things, the legislation amended discrete provisions of already-existing legislation.  As relevant here, Section 922(a) of Dodd-Frank amended the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78a-78*ll*, by creating the Anti-Retaliation Provision, thereby providing a private right of action against an employer who retaliates against a statutorily defined "whistleblower" for engaging in three categories of protected activity, one of which is "making disclosures that are required or protected under [Sarbanes-Oxley]."  15 U.S.C. § 78u-6(h).  Separately, Congress amended 18 U.S.C. § 1514A, which was the private right of action against retaliation that had been enacted by Sarbanes-Oxley, by "adding at the end" a prohibition against

predispute arbitration agreements (sometimes referred to as an "anti-

arbitration provision") for claims arising under the earlier statute:

> (1) Waiver of rights and remedies. -- The rights and remedies
> provided for in this section may not be waived by any agreement,
> policy form, or condition of employment, including by a predispute
> arbitration agreement.
>
> (2) Predispute arbitration agreements. -- No predispute arbitration
> agreement shall be valid or enforceable, if the agreement requires
> arbitration of a dispute arising under this section.

18 U.S.C. § 1514A(e).

Of critical importance to the pending motion is the absence of an

analogous prohibition in the Anti-Retaliation Provision itself.  The Exchange

Act, Sarbanes-Oxley, and Dodd-Frank are separate pieces of federal legislation,

each of which provides a party with distinct rights and responsibilities.  For

instance, in order for a party to bring an improper retaliation claim in federal

court under Sarbanes-Oxley, the party must first file a complaint with the

Occupational Safety and Health Administration of the Department of Labor

("OSHA"), the agency vested with authority to receive such complaints.  29

C.F.R. § 1980.103(c); 18 U.S.C. § 1514A(b)(1)(A).  A federal court may not hear

a Sarbanes-Oxley claim that is not first submitted to OSHA.  *Wong* v. *CKX, Inc.*,

890 F. Supp. 2d 411, 417 (S.D.N.Y. 2012).  In contrast, and as particularly

probative here, a party may commence suit under the Anti-Retaliation

Provision without complying with a similar administrative exhaustion

requirement.

In addition, the remedies available under the Anti-Retaliation Provision

surpass those available under Sarbanes-Oxley.  A plaintiff bringing a claim

under Sarbanes-Oxley may obtain "the amount of back pay, with interest," while a claim under the Anti-Retaliation Provision allows a plaintiff to receive "2 times the amount of back pay otherwise owed to the individual, with interest," and, further, can enable a plaintiff, in certain circumstances, to qualify for an "award" of between 10 and 30 percent of the total monetary sanction imposed by the government in a successful enforcement action based on information disclosed by the plaintiff.  *Compare* 18 U.S.C. § 1514A(c), *with* 15 U.S.C. § 78u-6(b), (h)(1)(C).

Plaintiff's contention that his claim is nonarbitrable is premised entirely on his assertion that his Complaint asserts a "claim arising under" Sarbanes-Oxley because the disclosures that he made (which were the ostensible predicates for his termination) were protected under Sarbanes-Oxley.  (Pl. Opp. 18).  Not surprisingly, Plaintiff seeks to benefit from the prohibition of predispute arbitration agreements for claims arising under Sarbanes-Oxley. Defendants maintain otherwise, contending that Plaintiff states a claim only under the Anti-Retaliation Provision (Def. Reply 7), and that "Plaintiff cannot avoid arbitration on the ground that his Dodd-Frank claim is premised on activity purportedly protected by [Sarbanes-Oxley]" (Def. Br. 12 n.7).

The Court agrees with Defendants.  Plaintiff cannot recast his claim to arise under Sarbanes-Oxley in order to benefit from the prohibition of predispute arbitration agreements afforded under that statute.  *Cf. Bassett* v. *Mashantucket Pequot Tribe*, 204 F.3d 343, 348 (2d Cir. 2000) ("[A] 'suit arises under the law that creates the cause of action.'" (quoting *T.B. Harms Co.* v.

*Eliscu*, 339 F.2d 823, 826 (2d Cir. 1964)).  For starters, Plaintiff cannot credibly dispute that his claim arises under the Anti-Retaliation Provision; the plain text of the Complaint recites a violation of the Anti-Retaliation Provision, and makes no similar claim regarding Sarbanes-Oxley.  (Compl. ¶¶ 1, 28).  Similarly, the Complaint states that the Court's jurisdiction arises under the Anti-Retaliation Provision, and the demand provisions recite the enhanced remedy under that provision of "two times the amount of back pay he is owed."  (*Id.* at ¶ 3).

Further evidence that Plaintiff's Complaint does not state a claim under Sarbanes-Oxley is found in the statute itself.  As discussed, unlike the Anti-Retaliation Provision, Sarbanes-Oxley requires that a party seeking relief under that statute exhaust his administrative remedies before proceeding to court. 29 C.F.R. § 1980.103(c); 18 U.S.C. § 1514A(b)(1)(A).  Plaintiff's claim before this Court has not been submitted to OSHA; as such, if indeed he were making a claim under Sarbanes-Oxley, the claim would not be ripe for review.  Plaintiff concedes this point in his Complaint when he identifies that he submitted an administrative complaint under Sarbanes-Oxley at the same time he filed the instant action, and that he would seek to amend the Complaint if the administrative action were not timely resolved.  (Compl. ¶ 1, n.1).

In short, although Plaintiff may have a claim under Sarbanes-Oxley, that is not the claim presently pending before this Court, and the Court cannot allow Plaintiff to convert his claim in an effort to thwart his agreement to arbitrate his dispute with Defendants.  *Am. Exp. Co.* v. *Italian Colors Restaurant*, 133 S. Ct. 2304, 2309 (2013) ("[C]onsistent with [the FAA], courts

must 'rigorously enforce' arbitration agreements according to their terms."
(quoting *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U.S. 213, 221 (1985)).  Only
one tenable conclusion flows from these facts — Plaintiff's Complaint states a
claim under the Anti-Retaliation Provision, not Sarbanes-Oxley.

> ## ii.  Plaintiff's Claim Is Not Within the Exception to the Parties' Arbitration Agreements

Because Plaintiff's claim arises under Dodd-Frank, it does not by its
terms fall within the exception to which the parties agreed for "[c]laims arising
under the Sarbanes-Oxley Act of 2002."  (Mara Decl., Exh. A).  It bears noting
that, to the extent this exception was informed by Congressional intent to
proscribe predispute arbitration agreements for certain claims under Sarbanes-
Oxley, the Court's construction of Plaintiff's claim in the instant litigation also
accords with the relevant case law, discussed in the remainder of this
subsection.

A court's "'duty to enforce arbitration agreements is not diminished when
a party bound by an agreement raises a claim founded on statutory rights.'"
*Guyden*, 544 F.3d at 382 (quoting *McMahon*, 482 U.S. at 226), *superseded on
other grounds by statute as stated in Wong* v. *CKX, Inc.*, 890 F. Supp. 2d at 421.
When statutory rights are implicated, "a party can prevent enforcement of the
arbitration agreement only by showing that Congress intended to preclude a
waiver of judicial remedies for the statutory rights at issue."  *Id.* (internal
quotation marks omitted).  "Proof of that intent could 'be discoverable in the
text of the statute, its legislative history, or an inherent conflict between

arbitration and the statute's underlying purposes.'" *Id.* (quoting *Gilmer* v.

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)).

In the only decision found by the Court on this issue, the district court

concluded that Sarbanes-Oxley's anti-arbitration provision does not apply to

the Anti-Retaliation Provision:

> Plaintiffs must arbitrate their claims brought pursuant to 15 U.S.C. 78-u because the Dodd-Frank act does not render pre-dispute arbitration agreements invalid or unenforceable for actions brought pursuant to this section. The Dodd-Frank act contains three sections creating rules to protect whistleblowers to be inserted into three different sections of the United States Code. The Dodd-Frank Act's whistleblower amendments to the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act both contain provisions that render pre-dispute arbitration agreements unenforceable for claims brought under these two sections. Unlike these other whistleblower provisions of the Dodd-Frank Act, Section 78-u contains no such provision. Plaintiffs assert this omission is a drafting error and suggest that the Court read the arbitration provision from the Sarbanes-Oxley act into Section 78-u. Plaintiffs offer as evidence of the inadvertent omission the parallels between the three sections, an SEC statement regarding the implementation of the Securities Exchange Act (not Section 78-u), and a claim that having such a provision in Sarbanes–Oxley but not Section 78-u would be illogical. This is insufficient evidence for this Court to conclude that Congress unintentionally omitted this provision from this section of the act. In fact, Congress proposed amendments to Section 78-u in July 2011, and those amendments do not include the arbitration restriction Plaintiffs allege was unintentionally omitted. *See* H.R. 2483, 112th Cong. (1st Sess. 2011). Without more, this Court may not read in such a provision, ignoring the plain language of the statute.

*Ruhe* v. *Masimo Corp.*, No. SACV 11-00734-CJC (JCG), 2011 WL 4442790, at

*4 (C.D. Cal. Sept. 16, 2011).

Support for the Court's conclusion is also found in decisions from other

courts that have refused to transplant Sarbanes-Oxley's anti-arbitration

provisions into other statutes, including those that were amended by Dodd-

Frank, but for which Congress did not include any anti-arbitration provision. *See, e.g.*, *James* v. *Conceptus, Inc.*, 851 F. Supp. 2d 1020, 1029 (S.D. Tex. 2010) ("Dodd–Frank's antiarbitration amendments to other statutes cannot be extended by implication to the antiretaliation provisions of the False Claims Act, especially when Dodd-Frank amended other parts of the False Claims Act but not the provision at issue."); *cf. Holmes* v. *Air Liquide USA, L.L.C.*, 498 F. App'x 405, 407 (5th Cir. 2012) (per curiam) (declining to extend anti-arbitration provision to non-qualifying claims based on theory that qualifying claims could have been brought; "Any other decision would lead to the untenable conclusion that the Act wholesale invalidates all broadly-worded arbitration agreements (of which there are many) even when plaintiffs bring wholly unrelated claims.  We must interpret the Act in a manner that avoids such unreasonable results."); *Beard* v. *Santander Consumer USA, Inc.*, No. 1:11-cv-11-1815 (LJO-BAM), 2012 WL 1292576, at *6 (E.D. Cal. Apr. 16, 2012) ("Therefore, because the [Servicemembers Civil Relief Act] does not contain[] provisions similar to the anti-arbitration provision found in legislation such as the Dodd-Frank Act, the Court finds that an arbitration proceeding satisfies the right to a civil action under the [Servicemembers Civil Relief Act].").

There is also nothing in the statutory text to indicate that Congress intended for the Sarbanes-Oxley predispute provisions to apply to the Anti-Retaliation Provision.  To the contrary, Section 1514A(e) explicitly limits its applicability to disputes arising under that section.  18 U.S.C. § 1514A(e) ("The rights and remedies provided for *in this section* may not be waived by … a

predispute arbitration agreement," and "[n]o predispute arbitration agreement shall be valid or enforceable, if the agreement required arbitration of a dispute arising *under this section.*" (emphases added)).  Perhaps more significantly, Congress amended Sarbanes-Oxley through Dodd-Frank to include this prohibition, and yet elected not to include a mirror provision in the Anti-Retaliation Provision of Dodd-Frank itself.  Consequently, the Court must interpret this absence to demonstrate Congress' intent that the Anti-Retaliation Provision not include any prohibition against predispute arbitration agreements.  *Gross* v. *FBL Fin. Servs.*, Inc., 557 U.S. 167, 174 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."); *cf. Gonzales* v. *Oregon,* 546 U.S. 243, 267 (2006) ("'Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.'" (quoting *Whitman* v. *Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001))).[5]

---

[5]     In this regard, Plaintiff argues that holding his claim not exempt from arbitration would be inconsistent with Dodd-Frank's "underlying purpose … to enhance, not limit, whistleblowers' protections under [Sarbanes-Oxley]."  Worse yet, Plaintiff claims, adopting Defendants' position would subject plaintiffs to a "Hobson's choice" of (i) filing a claim in court under Sarbanes-Oxley (after exhausting any administrative requirements) and forgoing the enhanced relief provided under the Anti-Retaliation Provision, or (ii) filing a claim under the Anti-Retaliation Provision to obtain the enhanced relief, but waiving right to judicial review of that claim.  (Pl. Opp. 23).  Plaintiff's "Hobson's choice" argument would appear to fail on its facts, since Plaintiff himself has pursued claims under both statutes in tandem.  In any event, irrespective of the bind that Plaintiff claims the statutes present, it would not be proper for the Court to redraft legislation, particularly where Congress' intent is clear.

>              **iii.        The Arbitrator Must Determine Whether Plaintiff's Claim**
>                           **Is Within the Scope of the Arbitration Agreements**

The remaining issue is whether this dispute is subject to arbitration, i.e., "the question of arbitrability." *Schneider*, 688 F.3d at 71 (internal quotation marks omitted). As noted, both parties have proceeded from the premise that the Court must resolve several questions of arbitrability. That does not appear to be the case. *But cf. Granite Rock Co.* v. *Int'l Broth. of Teamsters*, 130 S. Ct. 2847, 2857 n.5 (2010) ("Because neither party argues that the arbitrator should decide [whether their ratification dispute was arbitrable], there is no need to apply the rule requiring clear and unmistakable evidence of an agreement to arbitrate arbitrability." (internal quotation marks omitted)).

The "'[q]uestion of arbitrability' is a term of art covering 'disputes about whether the parties are bound by a given arbitration clause[,'] i.e., formation, as well as 'disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy[,'] i.e., scope." *Schneider*, 688 F.3d at 71 (quoting *Republic of Ecuador* v. *Chevron Corp.*, 638 F.3d 384, 293 (2d Cir. 2011)). The dispute before the Court is plainly one of "scope." Plaintiff maintains that this dispute is not arbitrable because "the parties' agreements to arbitrate expressly exempt arbitration of the cause of action in the Complaint." (Pl. Opp. 15). As to the Employment Agreement, Plaintiff points to provisions that exempt from arbitration claims arising under Sarbanes-Oxley (*id.* at 17), and those for which arbitration is "prohibited by applicable law" (*id.* at 19). As to the Form U-4, Plaintiff argues that it excludes Plaintiff's claim because that form requires only that Plaintiff arbitrate "any

24

dispute, claim, or controversy" that may arise with Defendants "that is required to be arbitrated under the rules, constitutions, or by-laws of [FINRA]," whereas FINRA's rules exempt from arbitration "a dispute arising under a whistleblower statute that prohibits the use of predispute arbitration agreements." (*Id.* at 19-20). Although the Court's holding that a cause of action under the Anti-Retaliation Provision is not excluded from arbitration may have the effect of resolving the issue of the arbitrability of Plaintiff's claim, in this case, it is not for the Court to decide the issue of scope.

When assessing arbitrability, "[t]he proper inquiry is whether 'there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator[s].'" *Alliance Bernstein Inv. Research and Mgmt, Inc.*, 445 F.3d at 125 (quoting *Contec Corp.* v. *Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (emphasis in original)). The Second Circuit has concluded that "[w]here 'parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" *Schneider*, 688 F.3d at 72 (quoting *Contec Corp.*, 398 F.3d at 208). Whether the relevant state law is that of Connecticut, which governs the Employment Agreement, or New York, the forum state, makes no difference; decisions from state courts in both states espouse rules consistent with Second Circuit precedent on this issue. *See, e.g.*, *Bell*, 293 F.3d at 567 ("Under Connecticut law, 'the arbitrability of a

dispute is a legal question for the court unless the parties have *clearly agreed* to submit that question to arbitration.'" (quoting *City of Bridgeport* v. *Bridgeport Police Local 1159, AFSCME, Council 15*, 438 A.2d 1171, 1173 (Conn. 1981) (emphasis in original)); *AFSCME, Council 4, Local 1303-325* v. *Town of Westbrook*, 75 A.3d 1, 6 (Conn. 2013) ("The intention to have arbitrability determined by an arbitrator can be manifested by an express provision or through the use of broad terms to describe the scope of arbitration, such as all questions in dispute and all claims arising out of the contract or any dispute that cannot be adjudicated." (internal quotation marks omitted)); *Contec Corp.*, 398 F.3d at 208 n.1 ("New York law … follows the same standard as federal law which respect to who determines arbitrability: generally, it is a question for the court unless there is 'a clear and unmistakable agreement to arbitrate arbitrability.'" (quoting *Shaw Group* v. *Triplefine Int'l Corp.*, 322 F.2d, 115, 121 (2d Cir. 2003))); *Zachariou* v. *Manios*, 891 N.Y.S.2d 54, 56 (1st Dep't 2009) ("Whether a dispute is arbitrable is generally an issue for the court to decide unless the parties clearly and unmistakably provide otherwise.  Where there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the AAA rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, courts will leave the question of arbitrability to the arbitrators." (internal citation and quotation marks omitted)).

Pursuant to the Employment Agreement, the parties agreed to arbitrate "any dispute, controversy or claim (including but not limited to those arising

out of or relating to this Agreement, the employment relationship between [Plaintiff] and [UBS Securities] or the termination thereof) … unless prohibited by applicable law." (Mara Decl., Exh. A). The Arbitration Agreement incorporated JAMS Employment Arbitration Rules & Procedures, under which

> [j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. Unless the relevant law requires otherwise, the Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

JAMS Employment Arbitration Rules & Procedures, Rule 11(c). Similarly, Plaintiff's Form U-4 requires Plaintiff "to arbitrate any dispute, claim or controversy that may arise between [Plaintiff] and [UBS Securities] … that is required to be arbitrated under [FINRA's] rules." (Mara Decl., Exh. C). Like the JAMS rules, FINRA Rule 13413 provides that "[t]he panel has the authority to interpret and determine the applicability of all provisions under the Code. Such interpretations are final and binding upon the parties."[6]

The JAMS and FINRA rules, explicitly incorporated into the respective agreements, empower an arbitrator to decide issues of arbitrability. For this reason, the Second Circuit has found, addressing both the JAMS and FINRA rules at issue here, that these rules evidence the parties' intent to arbitrate the question of arbitrability. *Emilio* v. *Sprint Spectrum L.P.*, 508 F. App'x 3, 6 (2d Cir. 2013) (summary order); *Alliance Bernstein Inv. Research and Mgmt., Inc.*, 445 F.3d at 127; *see also Gibson* v. *Seabury Transp. Advisor LLC*, 936 N.Y.S.2d

---

[6]     Pursuant to the Employment Agreement and Plaintiff's Form U-4, the arbitration in this case may be conducted by either JAMS or FINRA. (Def. Br. 10 n.5).

539 (1st Dep't 2012) (holding that "[t]he arbitration clause in the parties' agreement evinces a clear and unmistakable agreement to arbitrate arbitrability," where the agreement provided that the arbitration would be conducted under JAMS rules that submitted the issue of arbitrability to the arbitrator); *Smith Barney Shearson Inc.* v. *Sacharow*, 91 N.Y.2d 39, 47 (1997) ("[T]he language of the [FINRA] Code itself commits all issues, including issues of arbitrability … to the arbitrators.").

In *Emilio*, the Court held that "the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator." *Emilio*, 508 F.App'x at 5. In that case, as here, the parties "agreed to arbitrate any and all claims, controversies or disputes … arising out of or relating to its agreement with Emilio." *Id.* The agreement in *Emilio*, like the Employment Agreement, "incorporated by reference JAMS rules, which further provided that 'jurisdictional and arbitrability disputes … shall be submitted to and ruled on by the Arbitrator." *Id.* at *5-6. Likewise, in *Alliance Bernstein*, the Court held that FINRA Rule 13413 "clearly and unmistakably evinces an intent to submit any disputes over the interpretation of the Code rules to arbitration." 445 F.3d at 127 (holding that "the parties agreed, unequivocally, to submit disputes of this type to arbitration"). That the dispute here concerns the interpretation of the Code is clear from Plaintiff's argument that FINRA Rule 13201(b) prohibits arbitration of his claim — a proposition that Defendant hotly contests. (*See* Pl. Opp. 19-20).

The parties' agreements conclusively establish their agreement to submit the issue of arbtirability to the arbitrator. In this regard, the "general presumption that the issue of arbitrability should be resolved by the court," *Contec*, 398 F.3d at 208, is overcome on at least two independent grounds.[7] The Court must respect the parties' intentions, and withhold from addressing this issue. Consequently, the Court leaves it to the arbitrator to decide whether Plaintiff's claim falls within the scope of the parties' agreements to arbitrate.[8]

---

[7]   Even if JAMS or FINRA rules were not explicitly incorporated, the Employment Agreement's broad language expressing the parties' intent that "any dispute, controversy or claim ... arising out of or relating to" the Employment Agreement be arbitrated would likely be sufficient evidence, in and of itself, of the parties' "clear and unmistakable agreement to arbitrate arbitrability." *Shaw Group, Inc.*, 322 F.3d at 121 (holding that the parties' agreement to submit "any disputes concerning or arising out of" the parties' agreement evidenced their intent to arbitrate arbitrability); *see also Mehler* v. *Terminix Intern. Co. L.P.*, 205 F.3d 44, 49 (2d Cir. 2000) ("The clause provides for arbitration of 'any controversy or claim between the parties arising out of or relating to' the Agreement. We have previously decided that this is 'precisely the kind of broad arbitration clause that justifies a presumption of arbitrability.'" (quoting *Oldroyd*, 134 F.3d at 76)).

[8]   Out of an abundance of caution, the Court notes that had the parties not intended to arbitrate arbitrability, *Granite Rock Co.*, 130 S. Ct. at 2857 n.5, the end result in this case would still be the same — the parties would proceed to arbitration. This is because there appears to be no basis on which to conclude that Plaintiff's prototypical employment-related dispute over his termination fell outside the broad scope of the arbitration agreements to which he assented. *See Mehler*, 205 F.3d at 49 ("Once the court has determined the threshold issue of whether an arbitration agreement exists, and that the agreement is a broad one, as here, the court must compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks omitted)); *cf. Collins & Aikman Products Co.* v. *Bldg. Sys., Inc.*, 58 F.3d 16, 18-20 (2d Cir. 1995) (holding that "the wrongful termination claim [was] squarely within the scope of the arbitration clauses" that provided for "[a]ny claim or controversy arising out of or relating to [the parties'] agreement [to] be settled by arbitration"); *Hawkins* v. *Toussaint Capital Partners*, No. 08 Civ. 6866 (PKL), 2010 WL 2158332, at *5 (S.D.N.Y. May 27, 2010) (holding that employee's employment-related termination dispute was within the scope of his Form U-4); *French* v. *Wells Fargo Advisors, LLC*, No. 5-11-cv-246 (CR), 2012 WL 479961, at *5 (D. Vt. Feb. 14, 2012) ("Plaintiff's wrongful termination claim falls within the scope of [his Form U-4] and the motion to compel arbitration is granted.").

### 3.    This Litigation Will Be Stayed

Defendants request that the Court dismiss Plaintiff's Complaint or, in the alternative, stay the matter pending arbitration.  (Def. Br. 13).  Section 3 of the FAA provides that where the claims pending before a court are "referable to arbitration," the court "shall … stay the trial of the action" until the parties arbitrate the dispute.  9 U.S.C. § 3.  Courts are vested with equal discretion to dismiss rather than stay a case where, as here, all the claims before the court must be arbitrated.  *Arrigo* v. *Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 305 (S.D.N.Y. 2010) ("[W]here all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings."); *see also Salim Oleochemicals* v. *M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002).[9]

When determining whether to stay or to dismiss an action, district courts must abide by Second Circuit admonitions that they "be mindful of [the] liberal federal policy favoring arbitration agreements," and that "[u]nnecessary delay of the arbitral process through appellate review is disfavored."  *Id.* at 93.  Courts in this District have generally responded to these admonitions by staying, rather than dismissing, an action upon compelling a party to arbitrate.  *See, e.g.*, *Dixon* v. *NBCUniversal Media, LLC*, No. 12 Civ. 7646 (PAE), 2013 WL 2355521, at *11 (S.D.N.Y. May 28, 2013); *Duraku* v. *Tishman Speyer Properties,*

---

[9]    In this regard, the Second Circuit has recognized that whether a matter is stayed or dismissed may impact the speed with which the matter may be arbitrated.  Specifically, if a matter is dismissed, it is reviewable by an appellate court under § 16(a)(3) of the FAA.  9 U.S.C. § 16(a)(3); *Salim Oleochemicals*, 278 F.3d at 93 ("[A] dismissal renders an order appealable under § 16(a)(3).").  In contrast, "the granting of a stay is an unappealable interlocutory order under § 16(b)."  *Id.*; *see also* 9 U.S.C. § 16(b).

*Inc.*, 714 F. Supp. 2d 470, 474-74 (S.D.N.Y. 2010); *Douce* v. *Origin ID TMAA 1404-236-5547*, No. 08 Civ. 483 (DLC), 2009 WL 382708, at *5 (S.D.N.Y. Feb. 17, 2009).  Seeing no reason to depart from this trend, and in order "[t]o promote expeditious resolution of this dispute," the Court will stay this action pending the resolution of the parties' arbitration.  *Douce*, 2009 WL 387708, at *5.

## CONCLUSION

For the foregoing reasons, Defendants' June 14, 2013 motion to compel arbitration and to stay this proceeding is GRANTED.

The Clerk of Court is directed to terminate Docket Entry No. 27, and to place the case on the suspense calendar.

SO ORDERED.

Dated:      January 27, 2014
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge